Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| J.S., individually and on behalf of C.S., a minor,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED HEALTHCARE SERVICES, INC. And the BADGER METER, INC. MEDICAL BENEFITS PLAN,<br><br>        Defendants. | COMPLAINT<br><br>Civil Case No. 1:26-cv-00012 |

Plaintiff J.S. individually and on behalf of C.S. a minor, through her undersigned counsel, complains and alleges against Defendants United HealthCare Services, Inc., ("UHC") and the Badger Meter, Inc. Medical Benefits Plan ("the Plan"), as follows:

//

//

//

1

<u>**PARTIES, JURISDICTION AND VENUE**</u>

1.  J.S. and C.S.[1] are natural persons residing in Racine County, Wisconsin. J.S. is C.S.'s mother.

2.  UHC is an insurance company headquartered in Hennepin County, Minnesota and was the insurer and claims administrator, as well as the fiduciary under ERISA, for the insurance plan ("the Plan") providing coverage for the Plaintiff during the treatment at issue in this case.

3.  The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). C.S. was a participant in the Plan and C.S. was a beneficiary of the Plan at all relevant times. To this day, J.S. and C.S. are still Plan participants and beneficiaries.

4.  Plan participants and beneficiaries were told that UHC was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5.  At all relevant times, UHC acted as the agent for both the Plan and the plan administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6.  C.S. received medical care and treatment at Elevations RTC ("Elevations") from November 14, 2023 to August 30, 2024. Elevations is a licensed treatment facility located in Davis County, Utah, which provides subacute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

---

[1] C.S. identifies as female-to-male transgender.

7. UHC, acting in its own capacity or under the brand name Optum, denied claims for payment of C.S.'s medical expenses in connection with his treatment at Elevations.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because UHC does business in Utah, and the treatment at issue took place in Utah.

10. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and C.S.'s privacy will be preserved.

11. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### C.S.'s Developmental History and Medical Background

12. Born in 2009, C.S. was diagnosed with Meconium Aspiration Syndrome and jaundice. He was colicky the first few months of his life.

3

13. Throughout his childhood and adolescence, C.S.'s parents struggled with alcoholism.

14. The Covid 19 pandemic restrictions, combined with the deaths of C.S.'s grandfather and dog, took a toll on his grades which dropped from A's and B's to D's and F's.

15. On June 21, 2021, after years of his father suffering from seizures, C.S. witnessed the paramedics' unsuccessful attempt to resuscitate him, which was later diagnosed as a traumatic event for C.S.

16. In August 2021, C.S. identified as non-binary and became increasingly isolated.

17. On September 20, 2021, C.S. refused to attend school altogether.

18. In November 2021, after bouts of vomiting related to separation anxiety, C.S. started a PHP or Partial Hospitalization Program for trauma. On the second day of the program, C.S. refused to attend the program.

19. From November 24, 2021, to December 2, 2021, C.S. underwent acute psychiatric hospitalization at Rogers Behavioral Health (Rogers). Over the course of his treatment at Rogers, the treatment team increased C.S.'s dose of Sertraline to treat his condition.

20. After C.S.'s first stay at Rogers, he attempted suicide by cutting and attempted to open the vehicle door while C.S.'s mother was driving.

21. From December 5, 2021 through December 8, 2021, he was readmitted to Rogers' inpatient hospitalization.

22. From December 9, 2021 to January 20, 2022, C.S. was treated at Rogers' PHP.

23. The next day, C.S. was transferred to inpatient care at Rogers until January 31, 2022.

24. He was then treated on an intensive outpatient basis from January 31, 2022 to February 3, 2022.

25. On February 3, 2022, C.S. was re-admitted to the Emergency Department (ED), and then back to Rogers' inpatient.

26. On February 16, 2022, he was transferred to a residential program, Midwest Center for Youth and Families, where he was treated until April 7, 2022.

27. From May 30, 2022, to June 6, 2022, C.S. was readmitted to Rogers' inpatient program due to thoughts of self-harm.

28. Throughout the remainder of 2022, C.S. continued to be admitted and readmitted to both the ED and an inpatient program due to thoughts of self-harm and an inability to keep himself safe at home. These treatment programs took place at Aurora Psychiatric Units (Aurora).

29. In January 2023, C.S. went from identifying as non-binary to fully transgender male.

30. January through April 2023, C.S. made multiple visits to the ED for severe stomach aches which were thought to be due to an influenza infection.

31. On March 11, 2023, during an episode of dysregulation, C.S. broke the windshield of his mother's truck by pushing on it with his feet until it cracked.

32. On May 25, 2023, C.S. endorsed feeling unsafe. When his mother called Rogers, however, they refused to admit him, so instead C.S. went to Aurora where he stayed until March 29, 2023.

33. In April 2023, C.S. was admitted to the ED several more times. On April 19, 2023, he attempted suicide. He was transferred back to Aurora where he stayed until April 25, 2023.

34. On May 3, 2023, C.S. was supposed to begin treatment at Asheville Academy for Growth (AAG), a therapeutic boarding school in North Carolina. When J.S. reached AAG, C.S.

refused to get out of the car. It was not until May 8, 2023, that C.S. agreed to enter the premises.

35. On July 23, 2023, C.S. was admitted to Mission Hospital after a suicide attempt. He was admitted to Mission Hospital again on August 7, 2023, for attempting suicide via drowning. He was discharged on August 9, 2023.

36. On August 15, 2023, C.S. was admitted to Viewpoint Center in Utah where he was treated until October 16, 2023.

37. On October 16, 2023, C.S. transferred to Youth Care Treatment Center. He was discharged after attempting suicide with a ligature on October 26, 2023.

38. From November 6, 2023, through November 14, 2023, C.S. stayed at the Huntsman Mental Health Institute in Salt Lake City for stabilization.

**Elevations**

39. C.S. was admitted to Elevations on November 14, 2023.

40. United authorized his treatment at the residential level of care through January 24, 2024.

41. UHC required a peer-to-peer review, which was completed by Dr. Michael Connolly, MD, the attending psychiatrist at Elevations, on January 30, 2024.

42. On January 31, 2024, J.S. received a denial letter from UHC stating that C.S.'s residential treatment was no longer medically necessary and that its application of the CALOCUS-CASII criteria to C.S. called for a lower "Partial Hospital" level of care as of January 25, 2024, forward. The author's letter, Dr. Svetlana Libus, wrote in relevant part:

> The criteria are not met because: You are doing better. You can control your behavior much better. You are willing and able to participate in treatment. Your behavior is safe and predictable. You have no problems to take care of daily needs. Your thinking is clear. You do not have any medical problems or other issues that were interfering with your treatment. You have supportive family and safe home.

6

43. And yet, Dr. Libus's internal notes, withheld by UHC but later provided by the Plan Administrator, indicated that UHC's Dr. Libus knew that C.S. had engaged in self-injurious behavior less than a week before UBH's last day of partial coverage: on January 19, January 21, and suspected self-injury on January 23.

44. The internal notes of the UHC reviewer in support of the denial further alleged that C.S. "has no SI [suicidal ideation]." The medical record from January 25 stated, however:

> Mentors have been reporting suspicious behavior, so this writer asked about such. [C.S.] did not respond much when questioned. Charlie does not like to talk about his SI/SH[2] very much.

45. Dr. Libus's assertion that C.S. did not have any "medical problems…that were interfering with [his] treatment" is contradicted by the medical records, as UHC's third reviewer himself, Dr. Uy, would acknowledge as discussed below.

46. The denial letter, moreover, made no mention of Dr. Connolly's peer review and alleged that Dr. Libus had reviewed C.S.'s "clinical case notes" but failed to cite any medical records.

47. On February 1, 2024, UHC issued another denial letter stating in pertinent part:

> As requested, I have completed an **urgent appeal/grievance review** on **01/30/2024** 04:17 PM CST on a request we received on 01/29/2024. [emphasis added]
> This review involved a telephone conversation with your provider.
> After fully investing [sic] the substance of the appeal/grievance, including all aspects of clinical care involved in this treatment episode, I as an UHC employee have determined that benefit coverage is not available.
>
> The criteria are not met because: you have **not engaged in self-harm in several weeks,** and your behaviors and mood have improved. You've worked hard in therapy. Your team was concerned when they found a piece of glass that you were hiding on 01/26/2024, but you didn't use it to harm yourself and others, and there were no other repeat episodes of self-harm. You still have passive thoughts of death, but you don't have a plan or desire to actually kill yourself. You've had these

---

[2] Suicidal ideation/self harm

thoughts of death for a very long time and will need to work through these thoughts in therapy. You did well during a recent visit with your mother, and this is a good sign that you will continue to do well at home when you leave the facility. You did not have medical issues which made treatment difficult. **You may continue treatment at a lower level of care**. [emphases added]

48. The new reviewer prevaricated about the last time C.S. had engaged in self-harm, stating that it had been "several weeks" when in fact his internal notes indicate that it had been a little over a week.

49. Moreover, the reviewer omitted from the dismissive reference to an incident on January 26. involving a hidden piece of glass—less than a week before his letter—that C.S.'s treating psychiatrists and clinicians had good reason to suspect that it was the instrument of an imminent suicide attempt. A month later, as discussed below, C.S. carried out his initial plan: he attempted suicide by swallowing a piece of glass.

50. The UHC reviewer left out of his assessment that C.S. "has refused prazosin QHS for the past four nights," as subsequently revealed in an internal note dated January 30, 2024.

51. The letter was signed by Dr. Ronald Cristobal, a certified Child and Adolescent Psychiatrist. The recommendations of Drs. Libus and Christobal that C.S. should move to a lower level of care stand in sharp contrast with the standards of the American Academy of Child and Adolescent Psychiatry (AACAP), a yardstick of generally accepted standards of medical practice:

> Utilization management organizations are **not to be involved in the process of a patient's treatment.** Prescribing a particular course of treatment for a patient is the practice of medicine-the responsibility of the patient's physician. The prescribing of treatment by a physician who has not personally evaluated that patient and who does not have an agreement with the patient to be the treating physician, is unethical [emphasis added].

52. Although Dr. Cristobal's denial letter adduced the third-party CALOCUS-CASII guidelines as the basis for the adverse benefit determination, he did not disclose the

composite score and sub-scores he had assigned C.S. (depriving J.S. of the ability to argue against the correctness of the sub-scores) and did not cite to any Plan provisions, as required by ERISA.

53. On August 6, 2024, at odds with UHC's Drs. Libus and Cristobal who based their denials on the grounds that C.S.'s condition had improved significantly, UHC issued a health statement for dates of service April 16, 2024, through April 30, 2024, stating coverage was denied because C.S.'s condition *had not improved enough*:

> Note S8: The information received does not support measurable progress toward defined treatment goals for these services. Therefore, additional benefits are not available.

54. On June 18, 2024, J.S. submitted a Level One Member Appeal.

55. Under ERISA regulations, she wrote, UHC was obligated to act in her best interest.

56. She pointed out that the UHC's February 1, 2024, denial letter indicated that UHC had mistakenly interpreted the peer-to-peer review performed on January 30, 2024, as an expedited appeal and that she was concerned that this administrative error could deprive her of her Level One Member Appeals rights.

57. J.S. added, moreover, that appeals must be submitted in writing according to the Plan and that UHC was not her authorized representative.

58. J.S. took exception to the allowed amounts featured on the Provider Remittance Advices (PRAs) she had received between December 29, 2023, and February 23, 2024, asserting that that they were lower than what she was entitled to receive under the terms of the Plan.

59. Citing a plan provision according to which non-network provider reimbursement can be determined by rates that are "typically accepted by a healthcare provider for the same or

9

similar service," she contended that that the initial claims that UHC covered at 58% should have been covered at 100% of the billed charges on the basis of single case agreements and Explanation of Benefits statements from other patients at Elevations.

60. She asked to be provided with UHC's rationale and breakdown for its 58% reimbursement rate of claims from admission to January 24, 2024.

61. J.S. wrote that she was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

62. J.S. lamented that United's reviewer, Dr. Libus, issued conclusory statements that C.S.'s treatment at Elevations was not medically necessary without citing any clinical evidence in the medical records.

63. She requested each reviewer's CALOCUS-CASII's composite score and sub-scores in the six dimensions, including clinical information used in the process. J.S. contended that C.S.'s sub-scores in Dimensions I and II should be 4, which alone justified a residential level of care according to CALOCUS-CASII.

64. J.S. expressed concern that the denial of payment for C.S.'s treatment was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services in the same classification.

65. J.S. identified skilled nursing facilities and rehabilitation hospitals and inpatient hospice facilities as some of the medical or surgical analogues to the treatment C.S. received.

66. She argued that UHC may have imposed a medical management standards nonquantitative treatment limitation (NQTL) on the services rendered to C.S. at Elevations: With such statements as "[y]our behavior is safe and predictable," which indicate a lack of acute symptomology, UHC arguably imposed acute requirements on subacute or intermediate behavioral health care.

67. She further alleged that UHC may have applied an NQTL involving inequitable "plan methods for determining usual, customary, and reasonable charges," suspecting that UHC does not calculate the allowed amount or reimburse claims for intermediate behavioral health services at parity with intermediate medical services in practice.

68. The third NQTL J.S. was concerned about was network inadequacy. Within a one-hundred-mile radius, she had been able to identity only two in-network residential treatment centers, none of which was appropriate for C.S.'s comorbid needs. In contrast, J.S. found sixty-six hospice facilities and three hundred and seventy-nine in-network skilled nursing facilities.

69. She asked to be provided with a comparative parity analysis to determine whether the Plan complied with MHPAEA.

70. In addition, J.S. asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these

11

were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

71. J.S. attached several letters of medical necessity, including one by C.S.'s lifelong pediatrician who wrote in pertinent part:

> What [C.S.] needs is stability and long enough care in a residential facility with consistently developing relationships that he can learn to master the emotional regulation skills to eventually return to a more traditional outpatient placement. He has started to make such progress in developing these skills at Elevations but is certainly not yet to the point of being ready to leave, and cutting this program short due to denying insurance coverage would be completely disruptive to any progress that has been made and disruptive to eventually being able to function in a non-residential setting in the future.

72. J.S. further attached comprehensive samples from C.S.'s medical records showing that, though he still struggled with suicidal ideation at Elevations, as the months went by, his symptoms subsided and C.S.'s demeanor improved significantly.

73. On July 5, 2024, UHC's Dr. Uy[3] upheld the adverse benefit determination and provided the following justification:

> You were being treated for Major Depression and Post Traumatic Stress Disorder, a condition where you have feelings of sadness that hinder a person from participating in or enjoying typical activities and a disorder in which a person has difficulty recovering after experiencing a terrifying event.
> Based upon the clinical information provided, your current condition did not meet the Child and Adolescent Level of Care Utilization System/Child and Adolescent Service Intensity Instrument (CALOCUS-CASII) Level 5 - Non-Secure 24-Hour Services with Psychiatric Monitoring criteria for continued Mental Health Residential Treatment because:
> • The notes from the review with your provider, Dr. Michael Connolly, on 01/30/2024 indicated that they stated you were "making progress" and "improving". Dr. Connolly reported that you were not having any problems with your sleep or appetite and you were denying any thoughts of suicide. Note from the review with Dr. Connolly also stated that you had an off-campus pass with your mother the weekend of 01/19/2024 to 01/21/2024 and that there were no problems reported.

---

[3] The Plaintiff's appeal mistakenly refers to Dr. "Uly," but she meant Dr. Uy.

• The facility staff member's note on 02/09/2024 stated that you were found hiding sharp objects in your room but the Individual Session Note on 02/09/2024 stated that you reported "things are going well" and that you stated you were "fine".

• The Family Session Note on 02/16/2024 stated that you were "doing well and engaging well in programming".

• The Nursing Note on 02/17/2024 stated that nursing staff conducted a search of your body and did not note any new self-harm.

• Case notes indicate you had Irritable Bowel Syndrome but there were no serious medical problems that needed 24 hour care.

• The letter from your mother dated 06/18/2024 indicated that she was supportive, involved in treatment, and participated regularly in family therapy.

• Shift Notes from Elevations on 01/25/2024, 10/27/2024, 02/01/2024, and 02/06/2024 stated you were going to the bathroom very often and hiding from staff members at times, but you were otherwise "participating fully" in treatment. The notes stated you were "making friends" and were "well-liked" by your peers.

74. Dr. Uy omitted from his survey anything that did not support his narrative. For instance, C.S. was not following instructions on February 1, 2024, had to be escorted, "sat on the bedrm flr [sic] and cried." On February 6, was "talking w/ (peer) about eating batteries and ignored cues from mentors"; or on June 6, 2024 "his ankle and thigh where he had self-harmed."

75. Dr. Uy further stated that a "conversation with the member" was one of the bases for his review. J.S., however, denies having ever spoken to him. Nothing in Dr. Uy's internal notes references such a conversation.

76. On August 29, 2024, J.S. submitted a Level Two Member Appeal.

77. J.S. responded to Dr. Uy's choice of excerpts from the medical records. She pointed out that C.S.'s condition after his off-campus pass had deteriorated: he isolated himself from his peers and treatment team after his return from his pass; the next day he ate a piece of Styrofoam at lunch, hence the need for consistent monitoring and support.

78. As to C.S.'s statement that he was "fine," J.S. reproved UHC for omitting the pertinent detail that not only did staff at Elevations find sharp objects in C.S.'s room, but also

bloody paper towels. C.S.'s refusal to discuss in therapy his self-harm, J.S. asserted, was evidence C.S. needed residential treatment.

79. She rebuked Dr. Uy for misrepresenting and tampering with the Nursing Note on February 17, 2024, in which he alleged that "nursing staff conducted a search of [C.S.]'s body and did not note any new self-harm." In actuality, the nursing note indicated that C.S. had denied any new self-harm; however, nursing was unable to confirm this because C.S. wouldn't let them search his body.

80. Further evidence of UHC's departure from a full, thorough and fair review, J.S. noted, was UHC's glaring omission of C.S.'s suicide attempt on February 23, 2024, by hanging and swallowing a small piece of glass.

81. J.S. drew attention to C.S.'s hospitalizations that occurred while C.S. was on leave of absence from Elevations, which she asserted were further proof of the medical necessity of his residential treatment:  On, June 28, 2024, an ambulance came to pick C.S. up following suicidal ideation and on August 9, 2024, he attempted suicide via Tylenol overdose. J.S. asked UHC to examine the medical records associated with these incidents.

82. She upbraided UHC for assigning an underqualified Adult Psychiatrist to review C.S.'s records. Dr. Uy had no board-certification in Child and Adolescent Psychiatry. This violated generally accepted standards established by AACAP and URAC. Even CALOCUS-CASII recommends that mental health professionals evaluating the medical necessity of treatment of minors have "training specifically in child, adolescent, and family treatment."

83. Additionally, she lamented UHC's failure to supply the detailed methodology she had requested as to how UHC had calculated the reimbursement rate for the authorized dates of service from November 14, 2023, through January 25, 2024.

14

84. She expressed dismay about UHC's refusal to disclose the CALOCUS-CASII scores and sub-scores it had assigned C.S. stating that the absence of that information impeded her ability to advocate effectively on C.S.'s behalf.

85. J.S. also criticized UHC for withholding the parity analysis she had requested. She reiterated her request for pertinent MHPAEA documents.

86. On October 3, 2024, UHC upheld the denial and confirmed that the Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

87. On October 16, 2024, J.S.'s advocate telephoned UHC to discuss J.S.'s appeal but was hung up on.

88. The denial of benefits for C.S.'s treatment was a breach of contract and caused C.S. to incur medical expenses that should have been paid by the Plan in an amount totaling over $230,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B) Against UHC and the Plan)

89. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as UHC, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

90. UHC and the Plan failed to provide coverage for C.S.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

91. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim

denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

92. The denial letters produced by UHC do little to elucidate whether UHC conducted a meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled. UHC failed to substantively respond to the issues presented in C.S.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

93. In fact, UHC's denial letters do not address the arguments raised by C.S. in any substantive capacity.

94. As revealed by UHC's internal notes disclosed by the Plan Administrator, UHC had at its disposal C.S's CALOCUS-CASII sub-scores and composite score but refused to disclose them to the Plaintiff despite her repeated requests. By so doing, UHC violated its fiduciary duties under ERISA to provide C.S. with a full and fair review of the denied claims and violated ERISA's claims procedure regulations.

95. Illustratively, the sub-score UHC's Dr. Libus assigned C.S. for "Dimension III: Co-Occurrence of Conditions" across four domains (psychiatric, substance use, medical and developmental), i.e. "1," cannot be correct because C.S.'s medical records make it clear that he had several *medical conditions* alongside his psychiatric diagnoses: GERD (Gastroesophageal Reflux Disease),lactose intolerance, and asthma, raising his score to a minimum of "2" in Dimension III.

96. But J.S. could not point this out in her appeals because she didn't know that UHC had assigned C.S. an impossibly low score in this dimension. By repeatedly refusing to provide J.S. with the sub-scores UHC had assigned C.S., UHD failed to provide the

"material or information necessary for the claimant to perfect the claim" in violation of 29 C.F.R. § 2560.503-1(g)(1)(iii) of ERISA's claims procedure regulations.

97. UHC and the agents of the Plan breached their fiduciary duties to C.S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in C.S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of all the relevant documents and information to claimants upon request, and to provide a full and fair review of C.S.'s claims.

98. The actions of UHC and the Plan in failing to provide coverage for C.S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

99. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3) Against UHC and the Plan)

100.     MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of UHC's fiduciary duties.

101.     MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

102. MHPAEA violations can be both quantitative (e.g., a coverage limit of one month for mental health services and six months for medical surgical services) or nonquantitative (such as requiring supervision by a doctor at a mental health facility and a doctor's aide at a medical/surgical facility.)

103. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

104. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

105. The application of the medical necessity criteria used by UHC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the application of the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

106. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for C.S.'s treatment include subacute inpatient treatment

18

settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

107. When UHC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

108. UHC and the Plan evaluated C.S.'s mental health claims employing medical necessity criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

109. The Departments of Labor and Health and Human Services jointly compiled a list of "warning signs" which often accompany a violation of MHPAEA. A preauthorization requirement for mental health care when no such requirement is imposed on comparable medical or surgical care is one of these signs.

110. The Plan requires pre-approval for residential treatment by the "Mental Health/Substance-related and Addictive Disorders Services Administrator" but does not universally require preauthorization for analogous medical or surgical care.

111. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, UHC's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that C.S. received. UHC's improper use of acute inpatient medical necessity criteria is revealed in the statements in UHC's denial letters such as "you have not engaged in self-harm."

112. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the subacute level of care that C.S. received.

113. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

114. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

115. In addition, the level of care applied by UHC failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

116. The recommendations by UHC's Drs Libus and Cristobal that C.S. return to lower levels of care, all of which he had repeatedly tried the past weeks and months immediately preceding C.S.'s admission to Elevations, violate MHPAEA's regulations that prohibit "fail first" requirements to satisfy medical necessity criteria to qualify for coverage.

117. This requirement by UHC also runs afoul of the "Prior Authorization and Utilization Management Reform Principles" (PAUMRP) because they require that patient fail lower levels of care before being admitted to higher levels of care.

118. In addition, the most endorsed document by medical specialty societies, including the American Psychiatric Association (APA), AACAP, and the American Medical Association (AMA):

> Forcing patients to abandon effective treatment and repeat therapy that has already been proven ineffective under other plans' step therapy protocols delays care and may result in negative health outcomes.

119. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

120. In contrast with earlier InterQual SNF guidelines, which are silent on the topic, the 2025 edition which J.S. was able to obtain from the Plan Administrator states:

> **The presence or absence of a patient's potential to improve does not impact eligibility for coverage of a skilled service** (i.e., skilled therapy, skilled nursing). Coverage for skilled services is instead based on the patient's individualized need. For maintenance services, skilled care must be reasonable and necessary to maintain a patient's current condition or **to prevent or slow further decline**. [emphases added]

This position is germane to the Medicare requirements of the Jimmo Settlement, as of 2013, which SNF guidelines are expected to follow but which InterQual ignored until 2025.

121. As another example of the Plan's improper application of its criteria to evaluate the treatment C.S. received, the Defendants relied on assertions such as "[y]ou are willing and able to participate in treatment" as a justification to deny treatment. In fact, "[y]ou are willing and able to participate in treatment" serves as an indicator rather than a contra-indicator of the medical necessity of treatment in a non-acute residential setting.

122. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of medical practice for residential treatment centers include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

123. Licensing, regulatory, and accreditation entities do not allow sub-acute inpatient facilities such as residential treatment facilities to treat individuals who have acute care symptoms such as patients who is an imminent risk of harm to self or others or suffering from other acute level conditions such as active psychosis.

124. Through its imposition of requirements which are stricter than those dictated by generally accepted standards of care as reflected in the licensing, regulatory, and accreditation entity requirements, UHC violates MHPAEA.

125. UHC violates MHPAEA because it relies on generally accepted standards of care and the standards of licensing, regulatory, and accreditation entities to develop its medical necessity guidelines but holds residential treatment to stricter standards for medical necessity criteria beyond what is advised and considered appropriate by the relevant licensing, regulatory, and accreditation entities.

126. In addition, for residential treatment facilities providing mental health and substance use disorders, UHC and the Plan fail to provide a comparable degree of network residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

127. UHC paid for 58% of C.S.'s first few weeks at Elevations. And yet, UHC's "Mental Health Parity and Addiction Equity Act Disclosure Network Adequacy Frequently Asked Questions," provided by the Plan Administrator, indicates that UHC

"ha[s] a process to let members see an out-of-network provider *at in-network costs* (italics added) if there aren't enough providers."

128. The failure by UHC and the Plan to provide adequate network facilities for subacute inpatient treatment of mental health and substance use disorders compared to the network facilities for subacute inpatient treatment of medical and surgical disorders resulted in a payment disparity for covered treatment that violates MHPAEA.

129. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and UHC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

130. UHC and the Plan did not produce all the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that UHC and the Plan were not in compliance with MHPAEA.

131. The violations of MHPAEA by UHC and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

23

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants because of their violations of MHPAEA;

(e) An order requiring an accounting of the funds wrongly withheld, by each Defendant, from participants and beneficiaries of the Plan due to the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for her loss arising out of the Defendants' violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

132. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

133. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of fail-first criteria for medical necessity are not available as remedies for a wrongful denial of plan benefits.

24

134. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a subacute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

135. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C.§ 1132(a)(1)(B).

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for C.S.'s medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day of January 2026.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiff

County of Plaintiff's Residence:
Racine County, Wisconsin